**J. F. COOLEY, Appellant,**

v.

**The BOARD OF EDUCATION OF the FORREST CITY SCHOOL DISTRICT et al., Appellees.**

No. 71–1312.

United States Court of Appeals, Eighth Circuit.

Jan. 6, 1972.

Philip E. Kaplan, Walker, Kaplan & Mays, Little Rock, Ark., Jack Greenberg, Norman J. Chachkin, New York City, for appellant.

Harold Sharpe, Sharpe & Wilkinson, Butler & Hicky, Forrest City, Ark., for appellees.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This action is one instituted by Reverend J. F. Cooley in the United States District Court for the Eastern District of Arkansas. The relief sought is a declaration that Rev. Cooley's mid-term discharge, without notice and without a hearing, from employment as a teacher of social science, Arkansas history, and good citizenship in the Lincoln Junior High School, Forrest City, Arkansas was premised upon constitutionally interdicted grounds, an injunction requiring his reinstatement, and back pay for the period between his termination and the end of that academic year. The complaint names as defendants and seeks relief against the Board of Education of the Forrest City School District and its superintendent. Judge Harris, after conducting a hearing, dismissed the complaint on the merits. Federal court jurisdiction is established under 28 U.S.C. § 1343(3) and (4) to entertain the claim for relief created by 42 U.S.C. § 1983.

Rev. Cooley is a Negro. He possesses academic degrees in social science and theology. He is certified to teach in Arkansas schools. Prior to his discharge he had taught in the all-Negro Lincoln school continuously for eleven years and three months. He has been a minister of the Presbyterian faith, with his own congregation, since commencing his employment as a teacher in Forrest City.

A description and understanding of Rev. Cooley's extramural activities will perhaps illuminate the events leading up to this litigation and thereby place the legal questions in their proper factual context. Throughout his career as a teacher in the Forrest City school system, Rev. Cooley had been acutely interested in young people and actively engaged in civil rights work. He served for more than 6 years as a juvenile probation officer. He organized "Cooley's Athletic and Teen-agers Club" to "give scholarships to needy graduating members, to purchase and repair needed equipment to compete in summer tournament, and to purchase a new (larger) bus for transportation." He coached summer baseball and softball. His political life while in Forrest City is a record

of indefatigable effort. He served as president of the Forrest City Council on Human Relations. He organized the Committee for Peaceful Coexistence in the community and was active in its subsequent work. He sought election as State Representative but lost by 5000 votes. He appeared on television. He ventilated his civil rights views through letters to the editors of various local newspapers, some of which were published. In sum, it fairly can be said that the extramural activities of Rev. Cooley brought him some publicity and some influence in the black community.

There are positive indications in the record that the interaction of Rev. Cooley's extramural activities with his duties as a teacher produced some belief in the minds of his superiors that his ability to properly fulfill his daily responsibilities in the classroom was impeded by the intense degree of his civic involvement. His intermediate supervisor, Superintendent Irving, a defendant here, spoke with him on several occasions with a view toward encouraging him to refrain from activity tending to produce direct interference with his classroom duties or the day-to-day operation of the school. While there is little direct evidence relating to these frequent conversations, the record makes clear that Rev. Cooley felt resentment at being queried about his outside activities. The record reveals that in each instance Rev. Cooley would categorically deny taking part in any activities which adversely affected the operation of the school; that he always would concede his sincere interest in civil rights, while emphasizing that he limited his role to that of counseling restraint and encouraging only peaceful action, and that he would steadfastly defend his right to participate in public debate and political activity.

On the evening of February 2, 1969 the Committee for Peaceful Coexistence held a meeting at Rev. Cooley's church over which he presided. There is conflicting testimony as to what subject the meeting concerned. It is clear, however, that the meeting adjourned at a late hour and that there were school children in attendance. The next morning, Rev. Cooley, at the request of Superintendent Irving, appeared in the Superintendent's office. He was questioned concerning the wisdom of involving young children in these late-evening meetings. Superintendent Irving explained in some detail that he had received reports from his staff that such meetings were interfering with the children's school work and that many of them were not doing well in school as a result. He stated that his reports indicated that certain of the children would come to school with an embittered attitude. In response to these remarks Rev. Cooley is said to have agreed that young children should not participate in further late-evening meetings.

Apparently, a synthesis of all of the foregoing facts caused Rev. Cooley to conclude that he was being treated unfairly, for it is against this background that, on February 14, 1969, through a letter directed to Superintendent Irving, he chose to assert himself in resentment against those whom he felt were attempting unreasonably to constrict his civic activities. The letter enumerated 9 separate and specific ways in which Rev. Cooley thought Superintendent Irving had infringed his constitutional rights. It concludes:

"I have worked hard to maintain peace and order in the community. I have succeded [sic] without the help of others. Yet, I am always condemned by you and the certain Negro leadership. My only recourse now is to turn away from the teenagers and see what you will have. Let us see if your news carriers can handle the students and radicals in this community. I have taken enough abuse for the good I have tried to do."

"In closing there is no one I fear. I only wanted to help. I was not welcome. Therefore when I am needed, I will not be available."

By way of postcript he states:

"I will *not* meet with you again on these matters unless my Principal has

been notified, and my accuser present."

Superintendent Irving received the letter and immediately presented it to the Board at its monthly meeting. He related to the Board his belief that it would be difficult for him to work with Rev. Cooley in the future. Formal Board action was deferred until March 18, whereupon Superintendent Irving was instructed to immediately terminate Rev. Cooley's services. This was done March 19, 1969. Rev. Cooley remained unemployed until June 1969. The parties have stipulated that the discharge was accomplished summarily, without notice and without a hearing. Rev. Cooley made no request for a hearing.

### I

In his complaint, Rev. Cooley contends that his midterm discharge was invalid because it allegedly was based on his continued and accelerated participation in civil rights activities, "none of which interfered with his professional performance as a teacher." Alternatively, he suggests that his letter to Superintendent Irving consists of private, unpublished remarks, made within the protective ambit of the First Amendment. He asserts that because the Board's action was grounded solely on the letter, his termination necessarily involved the application of a standard proscribed by the First Amendment. Finally, Rev. Cooley alleges that he was constitutionally entitled to notice setting forth the reasons for his discharge, and a hearing thereon.

Judge Harris' published memorandum, D.C., 327 F.Supp. 454, concludes that Rev. Cooley's discharge was based on good cause; that the letter constituted a wilful flaunting of authority and mani-fested a refusal to comply with reasonable requests of his superiors, and that the record revealed no evidence that Rev. Cooley was discharged on the basis of his race, civil rights activities, or any public expression of views with regard thereto. The court then held that Rev. Cooley's termination was due largely to his own demeanor and conduct and did not offend any of his constitutional or legal rights. There is no specific finding with regard to Rev. Cooley's asserted entitlement to notice and hearing.

### II

In this court, Rev. Cooley urges us to reverse the judgment against him and to predicate that disposition on the First Amendment issues. The defense takes the opposite position by asserting that Judge Harris' factual findings have substantial record support with the result that they cannot now be disturbed. See Fed.Rules Civ.Proc. rule 52(a), 28 U.S. C.A. The First Amendment issues are ones that need not be resolved in this case. This is so because we have concluded that even if the defense position on these questions is correct, the judgment of the trial court must nevertheless be set aside for another quite independent reason.

### III

The jurisprudential basis upon which the constitutional doctrine of procedural Due Process rests is the judicially-created notion that when Government acts so as to affect substantial and protected individual interests or to adjudicate important and protected rights, the Due Process Clause requires, in the absence of a significant countervailing governmental interest, that Government supply procedures which guarantee at least a modicum of fairness.[1] It seems

---

1. See, e. g., Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); Bell v. Burson, 402 U.S. 535, 539–542, 91 S.Ct. 1586, 29 L.Ed.2d 9 (1971); Boddie v. Connecticut, 401 U.S. 371, 374–380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), and cases there collected; Goldberg v. Kelly, 397 U.S. 254, 260– 266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), and Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 41 L.Ed.2d 1307 (1960). See also, Note, 70 Harvard Law Review 193 (1956) and Note, 81 Harvard Law Review 1045 (1970).

elementary to us that this sound principle should assume particularized importance when, as in this case, state action is operative to summarily terminate the services of a public school teacher prior to the natural expiration of the school year. Given the ensuing economic hardship of a summary deprivation of the source of one's livelihood, and in view of the awesome and potentially stigmatizing effect of mid-year termination, such a case as this assuredly presents one of the clearest instances where the rule of procedural Due Process, properly applied, must operate to interdict injurious and reckless governmental treatment.

To support its contention that the doctrine of procedural Due Process is not applicable to the facts of this case, the defense would have us attach controlling precedential significance to this court's previous holding in Freeman v. Gould Special School District of Lincoln County, Arkansas, 405 F.2d 1153 (CA8 1969), certiorari denied, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93.[2] That decision, it is argued, effectively deprives Rev. Cooley of the protection normally accorded by the Due Process Clause of the Fourteenth Amendment. We disagree.

It is true that Freeman tracks almost precisely the same factual ground present here. There, 6 public school teachers sought to contest a school board decision not to renew their contracts of employment for the next ensuing year. It was alleged that this refusal was bottomed upon the unsubstantiated conclusion of the school principal that these teachers were incompetent and insubordinate. After unsuccessfully presenting their side of the dispute to the board, the teachers sought judicial invalidation of the board's action on the theory that it was arbitrary, capricious, and unreasonable and therefore violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Our court stated that "[a]bsent statutory or contractual requirements, persons discharged for inefficiency, incompetency, or insubordination have no right to a hearing with rights of cross-examination and confrontation of witnesses." 405 F.2d, at 1161.

The precise point of factual difference between this case and Freeman is two-fold. First, the Freeman-plaintiffs, unlike Rev. Cooley, were accorded a hearing by the board despite the absence of statutory entitlement thereto.[3] This would seem to indicate that those plaintiffs were furnished notice of the reasons for their termination and some opportunity to be heard in regard thereto. Thus, the board in Freeman apparently had both sides of the dispute before it so that from a deliberate and purposeful consideration of all the facts it could particularize its judgment as to the accuracy of the charges at issue. In this respect, at least, our divided bench in Freeman was faced with an essentially different issue. Second, Rev. Cooley, unlike the Freeman-plaintiffs, was discharged in mid-year, and this significant factual difference between the two cases tends to make Rev. Cooley's situation an even stronger one. For in our view, a mid-year discharge increases the economic hardship and renders even greater the likelihood that subsequent employment opportunities will be significantly circumscribed. Because of these distinguishable factors, we are not persuaded that Freeman interposes binding precedent for resolution of the problem presented here. We think, contrarily, that as a matter of procedural Due Proc-

2. See Note, 44 New York University Law Review 836 (1969).

3. Arkansas teachers are not entitled to tenure nor are they afforded statutory procedural protection against summary school board action. See Ark.Stat.Ann. § 80–1304(b) Supp.1969; Shelton v. Tucker, 364 U.S. 479, 482, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); and Johnson v. Wert, 225 Ark. 91, 279 S.W.2d 274, 276 (1955). But see Tims v. Board of Education, 452 F.2d 551 (CA8 1971). Tims like Freeman is a case in which the board declined to renew an expired contract. However, in Tims, as in Freeman, the aggrieved teacher was afforded a hearing.

ess the interest of a public school teacher in his continued employment until the natural expiration of the academic years is, in the absence of a countervailing state interest of paramount significance, sufficiently fundamental to prohibit his mid-term discharge without an explication of the reasons which underlie termination and the opportunity meaningfully to be heard with regard thereto.[4] Moreover, it is our view that this straight-forward rule should apply irrespective of whether the teacher sustains actual and compensable damage as a consequence of his summary discharge. We base this holding on our feeling that a peremptory, mid-term dismissal without notice of reasons and an opportunity to respond presents an aggregate of facts so inherently suspect that, in the absence of significant countervailing considerations, the nature of the individual interest at stake demands the traditional procedural protection of the Due Process Clause of the Fourteenth Amendment.

### IV

■ We have canvassed this record in vain in an effort to lay our hands on a significant countervailing interest of the Board which outweighs Rev. Cooley's right to a fair procedure. Having done so, we are unable to discern a rational basis upon which to conclude that Rev. Cooley was not entitled to notice of the reasons for his discharge and a reasonable opportunity to explore fully why a mid-year discharge was appropriate.

We must therefore hold that the discharge procedure followed in this case deprived Rev. Cooley of his procedural rights.

### V

■ The remaining consideration concerns the question of relief. Initially, Rev. Cooley is entitled to a declaration that his March 19, 1969 discharge was constitutionally invalid. He is further entitled to reinstatement to his former position, or if that is unavailable, to a similar or comparable position in the Forrest City School System. We feel also that Rev. Cooley is entitled to a determination in the District Court as to whether he was damaged by his dismissal and if so, the amount of such damage. The period for which damages may be shown is the period between the date of his discharge and the effective date of his reinstatement. In making this determination, the District Court shall apply the normal rules of mitigation. We note from the amended complaint that Rev. Cooley seeks an award of attorney's fees as a component of his damages. It is our view that this is a question which is addressed initially and primarily to the District Court. We therefore direct the District Court to determine whether attorney's fees should be assessed and, if so, the amount thereof.[5]

The judgment of the District Court is vacated and the case is remanded for further proceedings consistent with the views herein expressed.

4. Compare Adler v. Board of Education, 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517 (1952) ; Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, 57 (1950), aff'd per curiam by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951), and Angilly v. United States, 199 F.2d 642, 644 (CA2 1952) with Slochower v. Board of Higher Education, 350 U.S. 551, 555, 76 S.Ct. 637, 100 L.Ed. 692 (1950) and Wieman v. Updegraff, 344 U.S. 183, 191–192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). See also, Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 896–899, 81 S.Ct. 1743, 6 L.Ed. 2d 1230 (1961) and Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 322 (1959).

5. See Kemp v. Beasley, 352 F.2d 14, 23 (CA8 1965) and Rogers v. Paul, 345 F.2d 117, 125–126 (CA8 1965). Compare Clark v. Board of Education of Little Rock School District, 449 F.2d 493, 502 (CA8 1971) ; Arkansas Education Association v. Board of Education of Portland, Arkansas School District, 446 F.2d 763, 770 (CA8 1971), and Cato v. Parham, 403 F.2d 12, 16 (CA8 1968).