**Mathew J. JACKSON, Plaintiff,**

v.

**The CITY OF AKRON, OHIO, et al., Defendants.**

**Civ. A. No. C 75–189 A.**

United States District Court,
N. D. Ohio, E. D.

April 5, 1976.

Edwin L. Parms, Akron, Ohio, for plaintiff.

Charles W. Zindle, Asst. Director of Law, Akron, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff Mathew J. Jackson, a Negro, initiated this action under 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment to redress alleged racial discrimination resulting in his discharge from the employ of defendant The City of Akron, Ohio (hereinafter Akron). The case having been tried to the Court on February 11, 12, 13 and 17, 1976, the following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

### FACTS

At 5:00 a. m. on July 3, 1973, plaintiff arrived at the Akron Sanitation Department's Gregory Street garage to commence his daily work routine. Plaintiff drove a garbage truck and worked with two waste collectors. Plaintiff and his companions were scheduled to work until about 11:45 a. m. that day.

At around 11:30 a. m., plaintiff and his companions arrived at Akron's Hardy Road landfill to dispose of their load. Plaintiff entered the "weigh booth," a small structure housing the landfill's scales and other business equipment, for the purpose of placing a phone call to the Gregory Street garage. Plaintiff asked Stan Junius, the booth's attendant, if he could use the phone. Junius said yes, but that he thought someone was on the other extension. John Baldwin, another Akron employee working at the landfill, worked in a nearby building and was speaking to his wife over his extension.

Plaintiff picked up the receiver several times and slammed it down in annoyance. At least once he spoke into the receiver using the word "bitch." The precise import of the comments was not established at trial, but the Court finds that they were rude and uncomplimentary.

A few minutes later, Frank Marshall, a foreman at the landfill, entered the booth. Upon ascertaining the situation, he suggested that plaintiff use the radio for his call. Plaintiff declined, saying he didn't know how to use the radio. Plaintiff told Junius to tell the caller to get off the line. Marshall then told plaintiff to tell him himself, as Baldwin had just entered the booth. Plaintiff had never before met Baldwin. Baldwin was white.

Baldwin told plaintiff the phone was free, but that he didn't like what had been said on the phone. Words passed, and a shoving contest began in the doorway of the booth. Junius intervened, taking a glancing blow from plaintiff, and upon his urging the men broke up just outside the booth. At all times during this altercation, plaintiff was the aggressor, although no fists were clenched and the physical aspects were comparatively mild. At most Baldwin received a slap to the face as plaintiff tried to reach over Junius at Baldwin.

At this point Baldwin began returning to his office and plaintiff started towards his truck. Baldwin then said to plaintiff, "You're in trouble now, nigger." Plaintiff then rushed at Baldwin again. Junius, who was just about to reenter the booth thinking the matter was at an end, turned around, assessed the situation, and stepped between the men. Plaintiff's momentum threw him into Junius and, with his outstretched, open hand, grazed Baldwin's shoulder. Baldwin fell to the ground, but was on his feet immediately. Again, at Junius' urging, the men separated and returned to their jobs. None of the men were seriously injured. Other than the few minutes involved in the altercation, no work time was lost. Most of the people in the area were other sanitation workers, employed either by Akron or by private companies.

Plaintiff and his waste collectors then drove back to the Gregory Street garage.

Plaintiff entered the office and spoke to Mr. Price, a black foreman, about the incident. Price was not plaintiff's supervisor. During this discussion, James Davis, plaintiff's supervisor, was standing a few feet away in a doorway, and overheard the conversation. Davis had previously received a call from personnel at the landfill about the incident.

Plaintiff told Price that someone was on the landfill phone talking to his "bitch" when plaintiff had tried to make a business call. Plaintiff further told Price that when Baldwin appeared, the men had "words" about whom Baldwin had been speaking with. Plaintiff then mentioned the shoving contest and ended with, "I put an end to that mess."

At this point plaintiff started to leave. Davis called to plaintiff, asking him to come into the office to talk. Surmising that Davis wanted to talk about the incident at the landfill, and believing he had the right under the union contract to have his union representative present at such a discussion, plaintiff declined and left. At this time plaintiff was on his own time.

Akron's normal procedure in discipline matters is to have the subject employee's foreman investigate the facts, including a discussion with the employee to hear his side of the story. If the matter is not thereby resolved, the foreman's superior investigates and makes a recommendation to the department head. The department head then makes a recommendation to Akron's Mayor, who is the appointing and discharging officer under Akron's charter. If it is ultimately decided to discharge an employee, the usual procedure is to make the effective date thereof subsequent to the formal notice of discharge, for the express purpose of allowing the employee to file an explanation if he so desires.

In plaintiff's case, this procedure was not followed. Instead of plaintiff's foreman or supervisor investigating initially, Robert Fahey, the Superintendent of the Sanitation Department, personally undertook the investigation of the subject incident.

Fahey first heard of the incident shortly before noon on July 3, 1973. Fahey went to the landfill that afternoon and obtained the written statements of Marshall and Baldwin. Fahey did not speak with Junius on July 3, 1973, although he obtained Junius' written statement on July 5, 1973. Fahey feared possible future violence between plaintiff and Baldwin, and believed that plaintiff was a violent person because Davis had previously told him that plaintiff had been involved in fights during non-working hours. Fahey also had at this time Davis' statement that plaintiff had refused to discuss the incident with him. Fahey concluded that this constituted insubordination. He concluded that plaintiff should be discharged.

During the latter part of 1972 and the first half of 1973, the disciplinary decisions of the administration of Akron were being reversed by the Akron Civil Service Commission almost regularly. In an effort to cure this situation, and perhaps incidentally to effect more uniformity in the city's disciplinary actions, Nicholas Buian, Personnel Director of Akron and the Civil Service Commission's administrative officer, informally assumed a "clearing house" position. Proposed disciplinary actions were brought to him. If he concurred, the recommendation was formally made to the Mayor. If he did not concur, he had no express authority to alter the department head's decision; yet it was understood at the time this procedure was established that the Mayor would back-up Buian's decisions.

Buian's scrutiny of proposed action was not in depth. Essentially, he would look for inconsistencies in the treatment accorded an employee. Although his precise function was not developed at trial, Buian's understanding thereof may be indicated from the following example. Buian testified that in one case, a department proposed to discharge an employee. Upon review of the employee's employment file, he discovered a previous statement by the administration that future violations would result in

suspension. Therefore, in that case Buian successfully urged that the discipline be limited to a suspension.

Pursuant to this arrangement, Fahey called Buian during the early afternoon of the day of the incident. Fahey related the bare essentials of the incident, and expressed his desire to discharge plaintiff immediately. It was decided that these two men would meet with Akron's assistant law director shortly thereafter. This was the first such meeting to occur regarding discipline matters during Buian's comparatively long tenure with Akron.

This meeting occurred at about 3:00 or 3:30 p. m. on the day of the altercation. As a result thereof, it was decided that plaintiff could be fired immediately, and that the notice of discharge could be made effective as of service thereon on plaintiff. The discharge papers were then executed late on July 3, 1973.

When plaintiff arrived for work on July 5, 1973, he was given the notice of discharge. The notice lists failure of good conduct and insubordination as grounds therefor, and contains the following explanation:

"Pursuant to Akron City Charter Section 116, you are hereby discharged from your employment with the City of Akron commencing the date and time hereinafter set forth. This discharge is based upon the following facts: On Tuesday, July 3, 1973, at approximately 11:30 a. m., while at the Hardy Road Landfill you accosted a fellow employee, used abusive language toward him, and struck the subject fellow employee causing him to fall to the ground. Following this altercation, you refused to make a statement and report thereof upon the request of your supervisor James G. Davis."

The notice recites that it became effective at 5:00 a. m. on July 5, 1973, three minutes prior to plaintiff's receipt thereof. Said notice also contains the following printed legend:

"In the event of a discharge, this effective date must be subsequent to the serving of this notice and after a reasonable time has been given the employee to make and file an explanation if he so desires."

It was the intended disregard of this requirement which apparently led to the meeting between Buian, Fahey, and the assistant law director.

Plaintiff appealed his discharge to the Akron Civil Service Commission. Prior to the hearing on plaintiff's claim, the commission members noted the procedural irregularity of making the discharge effective prior to notice. Buian and the assistant law director explained that the city considered the matter to be an emergency and that they believed that plaintiff had been afforded the opportunity to explain the incident to Davis, but had declined. The Commission then modified the discharge to a suspension effective July 5, 1973, until the hearing on the merits. After said hearing, at which plaintiff was not represented by counsel but was represented by his union, the discharge was reinstated. Plaintiff's was the first case to Buian's knowledge in which the Civil Service Commission had modified a disciplinary measure and then reinstated the original discharge.

From the testimony of two labor relations experts, the Court finds that a number of factors should be considered in determining what disciplinary action should be taken against an employee involved in a fight at work. Said factors include: the severity of the fight and the extent of any injuries; the amount, if any, of earnings lost by a participant; how the incident will affect the future performance of the employees, i. e. whether the employees can work together in the future and the effects on the morale of other employees; length of past service; past history of fighting; past employment record; who was the aggressor in the altercation; the relative status of the participants, i. e. were they of equal status; whether there was any damage to the employer's property; and whether the incident was viewed by members of the public and

thus might adversely affect the employer's public image. It appears that sound management techniques require a thorough investigation and weighing of the above factors before choosing a disciplinary measure. However, it must also be stated that fighting on the job is a comparatively serious matter, and therefore may constitute grounds for discharge on the first offense, under the proper circumstances.

Past history of fighting and the employee's employment record are two of the factors listed above. In plaintiff's case, there is no past history of on-the-job fighting or belligerent habits. Plaintiff's work record reveals the 1971 promotion to truck driver; bi-yearly work evaluations in which plaintiff was generally rated as a satisfactory employee; a number of merit pay increases; and a fairly regular pattern of absenteeism and tardiness. On April 7, 1970 plaintiff was suspended for seven calendar days, later reduced to three work days, for excessive absenteeism and tardiness. On December 28, 1971, plaintiff was suspended for three days for misuse of an Akron vehicle resulting in an accident on December 23, 1971.

Plaintiff's work record also contains two reports of misconduct on which no disciplinary action was taken. The first is dated August 27, 1968, and relates to plaintiff's use of a private vehicle during working hours. The second is dated June 9, 1973, and states that plaintiff drove his truck over a driveway and yard causing considerable property damage. Little or no explanation is contained in the record as to the ultimate resolution of these problems, and the Court makes reference to them herein only because they are contained in plaintiff's work record and said record is a factor in the choice of discipline.

Included among the exhibits introduced at trial are schedules, prepared by defendants, of all the discharges and suspensions effected by Akron from 1970 through 1975. Said schedules relate the department involved, the date hired, the date disciplinary action was taken, and the reason for the action taken. Beginning in 1973, the schedules also relate the race of the employees involved.[1]

As the years 1970 through 1972 are not racially coded, the only significant fact established thereby is that Akron did not discharge any employees during this period for fighting, although fights occasionally occurred and no disciplinary action was taken.

Examination of the schedule of discharges in 1973 reveals nineteen discharges, fifteen of which were of black employees. Five of the discharges were from the Sanitation Department. Of these five, three were for excessive absenteeism and one was within the probationary period. The remaining discharge was plaintiff's. All five were black. Plaintiff's was the only case of a discharge for fighting by Akron in 1973.

In 1974, Akron discharged twenty-four employees, eleven of whom were black.[2] There were four discharges from the Sanitation Department, of which three were of black employees. In 1974, there was one discharge for fighting. It was effected by the Motor Vehicles Department, and apparently involved fighting with a foreman; the discharged employee was white.

In 1975, there were thirty-seven employees discharged, of whom twenty were black.[3] The Sanitation Department discharged five employees, all of whom were black. There were no discharges in 1975 for fighting.

1. The schedule of dismissals has the racial coding for two of the 19 dismissals effected in 1972. The schedules are also coded by sex, beginning in 1973.

2. Three of the discharges in 1973 listed on the schedule are not racially coded. Therefore, the Court cannot establish the race of the employees involved.

3. The schedule does not contain a racial code for two of the discharges.

686

The schedule of suspensions indicates that during the period from 1970 through 1972 there were three suspensions for fighting. All three occurred in 1971, and all three employees were white.[4] The longest suspension was for three days. One employee allegedly assaulted a fellow employee and was insubordinate; said employee was given a three work day suspension.

In 1973, Akron suspended thirty-eight employees, of whom twenty-two were black. The Sanitation Department suspended three employees, all of whom were black. There were no suspensions for fighting in 1973.

In 1974, Akron suspended sixty-four employees, of whom twenty-four were black.[5] The Sanitation Department suspended eleven employees, of whom nine were black.[6] There were no suspensions in 1974 for fighting.

There were ninety-one suspensions of employees by Akron in 1975, of whom thirty-nine were black. The Sanitation Department suspended eighteen employees of whom fifteen were black.[7]

Two of the 1974 suspensions involved conduct similar to fighting. The first employee was suspended from the Water Department for bringing a concealed weapon, a gun, to work. This employee received a twenty work day suspension. The other case involved a crew leader who drew a pocket knife on three of his workers. The crew leader stated something to the effect that he would fight each man separately with his fists, but if all three of the workers fought him at once, he would use the knife. The crew leader had about twenty-seven years of service with Akron and was given a suspension of ten work days; he was white.

A large majority of the Sanitation Department's employees are black.

In the latter part of 1974, Akron hired Robert Beagle as Deputy Mayor in charge of labor relations. Prior to Mr. Beagle's employment, each department essentially made its own decision as to disciplinary matters including the choice of disciplinary measures imposed. As a result there was little, if any, uniformity between departments as to disciplinary action taken for similar conduct. Although Buian's informal role as "clearing house" may have added some uniformity to Akron's actions in this area, such role was not very effective in this regard. Review of the suspension and discharge schedules reveals a greater degree of uniformity during Beagle's tenure.

Although Davis had told Fahey that plaintiff had refused to make a statement about the incident, Fahey was apparently unaware that plaintiff had reported the incident to Price, though the latter was not plaintiff's foreman, and that Davis had overheard this conversation. Fahey was also unaware that Davis had not ordered plaintiff to report to him. In fact, Davis testified that he had merely requested plaintiff's cooperation; Davis did not consider plaintiff's failure to abide by said request to be insubordination.

At the time of plaintiff's discharge, he was earning $4.72 per hour. In 1974 there was approximately a seven percent (7%) general pay increase; the exact percentage was never established. In 1975, there was a seven point three percent (7.3%) general pay increase.

Plaintiff did not seek any employment during the remainder of 1973; nor did he actively seek employment in 1974.[8] During 1974, plaintiff worked part time

4. Although the schedule is not racially coded, this information is derived from other evidence introduced at trial.

5. Twelve of the 1974 suspensions are not racially coded.

6. The remaining two suspensions by the Sanitation Department in 1974 are not racially coded.

7. One of the Sanitation Department discharges is not racially coded.

8. Plaintiff testified that he sought employment in 1974 at the General Tire and Rubber Company. However, precisely when in 1974 was not established. In any event, the Court disbelieves plaintiff's testimony on this point.

at a car wash earning $60–$75 per week. In 1975, plaintiff actively sought employment, but was unsuccessful.

## DISCUSSION AND CONCLUSIONS OF LAW

■ On the basis of the evidence adduced during plaintiff's case in chief, the Court concluded at trial that plaintiff had established a prima facie case of discriminatory discharge. Plaintiff's account of the incidents which occurred on July 3, 1973 indicated only minimal culpability for the altercations; plaintiff also testified that he believed he was discharged on account of his race. Plaintiff's expert testified that plaintiff's conduct did not justify discharge. Moreover, the discharge and suspension schedules are some evidence that disparate discipline procedures were used by Akron. Finally, plaintiff established that he is a member of a minority group. On the basis of the evidence outlined above, the Court hereby reaffirms its conclusion at trial that plaintiff established a prima facie case of discrimination. Therefore, the burden of proving some legitimate, non-discriminatory reason for the discharge shifted to defendants Akron and John S. Ballard (hereinafter defendants). See *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864 (6th Cir. 1975); *Senter v. General Motors Corporation*, 532 F.2d 511 (6th Cir. 1976); *Vulcan Soc. of N. Y. City Fire Dept., Inc. v. Civil Serv. Com'n.*, 490 F.2d 387 (2nd Cir. 1973); *Alvarez-Ugarte v. City of New York*, 391 F.Supp. 1223 (S.D.N.Y.1975); *Bush v. Kaim*, 297 F.Supp. 151 (N.D.Ohio 1969).

Upon further consideration, however, the Court concludes that plaintiff has not established a prima facie case against defendants Moye, Wheeler and Nelson, members of the Akron Civil Service Commission. Explanation of this conclusion will follow below.

Plaintiff was discharged on two grounds: insubordination and fighting on the job. At trial Davis, plaintiff's supervisor, testified that he merely requested plaintiff to come into his office and talk. Plaintiff was then on his own time, and Davis did not consider plaintiff's refusal to be insubordinate, apparently because he merely requested plaintiff to accompany him to the office. Thus, the Court finds that the insubordination ground is meritless.

As is reflected by the Court's findings of fact, defendants did establish that plaintiff's behavior at the Hardy Road landfill was not as innocent as plaintiff's testimony inferred. Plaintiff was both rude and the aggressor. The Court finds that sound management techniques mandated disciplining of plaintiff's unruly conduct. However, whether discharge was required, or even within sound management discretion, is another matter.

Determination of the choice of disciplinary measures requires consideration of the factors enumerated in the Court's findings of fact. Application of those factors herein convinces the Court that discharge was unwarranted. The altercation was of minimal severity and neither party used clenched fists. Neither party was seriously injured, required medical treatment, or lost time from work as a result of injuries. There could be no more than an outside chance of recurrence of the altercation, both because a reprimand or other disciplinary action would probably have cooled the parties' ardor for future contact, and because plaintiff and Baldwin had never previously had personal contact and most likely would not in the near future because of their differing job assignments.

Plaintiff had approximately seven years employment with Akron, a factor which weighs in his favor. Plaintiff had no past record of fighting on the job. Plaintiff's previous employment record with Akron, while not outstanding, does not weigh in favor of discharge. The length of service from plaintiff's last

suspension militates against discharge.[9] Both of the participants to the altercations were of equal status; this is not a case of an employee striking a supervisor or vice versa. Finally, while the altercations occurred in public, the Court finds that this factor is of minimal significance in support of discharge on the facts of this case.

The Court's conclusion that discharge was unwarranted does not overlook the fact that fighting on the job is a serious infraction, meriting serious disciplinary action. Rather, the Court merely concludes that some lesser measure was called for by proper management techniques on the facts of this case.

■ The inferences which can be drawn from this conclusion are that the responsible officers were motivated by considerations other than those expressed, i. e. plaintiff's race; or that they merely exercised bad judgment. Upon consideration of all the evidence, the Court concludes that the former inference has been established.

This decision is supported not only by the facts that the insubordination ground was meritless and that the choice of discharge because of the altercations was unwarranted by sound management techniques. Other evidence, such as the unusual character of the procedures employed in plaintiff's discharge, and the resulting total insufficiency of one of the grounds for discharge; the practically unbridled nature of the various departments' discretion to choose disciplinary measures; and the inference of a practice or pattern of racial discrimination in the choice of disciplinary measures raised by the schedules of discharges and suspensions, supports this decision.

As the Court has previously found, Akron's normal disciplinary procedure required the supervisor of the employee involved to investigate and make recommendations to his superiors. Here, this procedure was by-passed and Fahey, the department head, personally undertook the investigation. His investigation was conducted in a matter of hours, and he did not even speak with Junius, the only witness not a participant in the subject events to have direct, personal knowledge of what transpired during both altercations, prior to the discharge. Fahey did not verify what Davis meant when he reported that plaintiff had refused to discuss the matter; rather he summarily concluded that said refusal constituted insubordination with no further investigation. Yet the charge of insubordination was, in fact, baseless, and that fact most likely would have been ascertained had normal procedures been followed. Also, Fahey indicated that he wanted to discharge plaintiff immediately, and a meeting between himself, Buian and the assistant law director occurred on the day of the altercations. This was, to Buian's knowledge, the first such meeting Akron officials had held. Finally, plaintiff's discharge was effective prior to the notice thereof, contrary to the printed provision on the notice of discharge.

These procedural irregularities, and the speed with which plaintiff's discharge was effected, when coupled with the comparatively mild character of plaintiff's infraction, strongly infer that some reason other than plaintiff's conduct on July 3, 1973 motivated the discharge. Defendants have not introduced evidence of any non-discriminatory motive, except for their claim that discharge was warranted.

While the choice of disciplinary measures ultimately rested with Akron's Mayor, the evidence establishes that, as a practical matter, each department primarily determined its own standards of discipline in 1973. Their discretion was, to a large extent, unbridled by published standards of other factors. As Robert

---

**9.** The Court does not consider the events listed in plaintiff's employment record with Akron as occurring on August 27, 1968 and June 9, 1973 as being more than minimally important in reaching a decision to discharge, because no explanation of any eventual determination that plaintiff so acted was made.

Beagle, Akron's Deputy Mayor in charge of labor relations termed it, Akron had no uniform disciplinary policies prior to his employment in the latter half of 1974. This conclusion is, to some extent, verified by the schedules. While it appears that Akron has corrected this problem under Beagle's supervision, the fact remains that at the time of plaintiff's discharge, there was apparently inconsistent handling of similar disciplinary matters between departments.[10]

The significance of this situation becomes apparent upon consideration of the opinions in *Senter v. General Motors Corporation, supra,* and *Rowe v. General Motors Corporation,* 457 F.2d 348 (5th Cir. 1972). To paraphrase *Rowe,* the existence of discharge "procedures which depend almost entirely upon the subjective evaluation and . . . recommendation of [a supervisor] are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action." 457 F.2d at 359. In the instant case, clearly the opportunity for covert discrimination existed.

The Court concludes that the schedules of suspensions and discharges are entitled to minimal weight. The schedules tend to substantiate the finding that different standards existed from department to department in 1973. They also demonstrate that most of the employees suspended or discharged from employment in the Sanitation were black. However, most of the employees in said department are black; therefore, a higher percentage of discharges and suspensions of blacks may be expected.

■ Said schedules also constitute some evidence that blacks received disparate treatment as to the choice of disciplinary measures. On many occasions blacks were discharged for conduct which, on the surface, appears similar or identical to that of whites who were merely suspended. This apparent disparity was admitted by Mr. Beagle, Akron's Deputy Mayor. Yet, because of the comparatively few cases of fighting for the years which are racially coded, thereby resulting in a statistically unsound basis for comparison; and because of the sparse informational background as to the many other factors necessarily considered in assessing the disciplinary problem in each of the subject cases, the Court concludes that the inference of discrimination to be drawn from the schedules is insufficient in and of itself to predicate a finding of discrimination. Cf. *Robinson v. City of Dallas,* 514 F.2d 1271 (5th Cir. 1975). The seeming disparity, unexplained by defendants is, however, entitled to some weight although the Court attaches only minimal significance thereto.[11]

■ In summary, the Court concludes that the discharge, as opposed to some lesser penalty, was unwarranted; the procedures utilized herein were highly irregular; at the time of plaintiff's discharge Akron had no uniformity in discipline from department to department, thereby providing a ready mechanism for covert racial discrimination; and the raw discharge and suspension data develops a weak inference of discrimination in choice of disciplinary measures. Together these facts convince the Court that purposeful racial discrimination motivated plaintiff's discharge. Therefore, clearly defendant Ballard, the discharging officer, and Akron are liable for the damages resulting to plaintiff.

These ultimate conclusions do not apply to the Akron Civil Service Commis-

---

**10.** While Buian's unofficial position as "clearing house" might have tended to reduce such inconsistencies, his understanding of his role, and apparently his actions thereon, do not establish that such a result was, in fact, effected.

**11.** For the sake of clarity, this Court wishes to express its opinion that although it has considered the schedules, its decision would be the same even if it had attached no significance to them.

sion members. The involvement of Moye, Wheeler and Nelson was limited to review of the decision to discharge plaintiff. While some procedural irregularities occurred prior to hearing, the Court finds no evidence that they were racially motivated. Rather, such irregularities resulted from the Commission's determination to require procedural responsibility in discharge cases. Only after hearing did they determine that the discharge was appropriate.

The record is incomplete as to what evidence the Commission members heard. Absent proof that they had the benefit of Davis' admission that plaintiff was not insubordinate, the Court cannot conclude that the decision to uphold the discharge was unwarranted, since this ground, in conjunction with the altercations, would warrant discharge. Absent further facts indicating purposeful discrimination, the Court concludes that any inference of racial discrimination derivable solely from the above mentioned procedural irregularity and the ultimate upholding of the discharge is too tenuous a basis upon which to predicate a finding that plaintiff established a prima facie case against the Commission members.

In view of the Court's finding of racial discrimination by defendants Akron and Ballard, plaintiff is entitled to reinstatement and back pay. Cf. *Hatton v. County Board of Education of Maury Co., Tenn.*, 422 F.2d 457 (6th Cir. 1970); *Jannetta v. Cole*, 493 F.2d 1334 (4th Cir. 1974); *Cooley v. Board of Ed. of Forrest City School Dist.*, 453 F.2d 282 (8th Cir. 1972).

However, the back pay award must be reduced by plaintiff's actual earnings during the period following his discharge or by the amounts "earnable with reasonable diligence." *Equal Employment Op. Com'n. v. Detroit Edison Co.*, 515 F.2d 301, 315 (6th Cir. 1975). Plaintiff did not seek employment in 1973 or 1974. Therefore, the Court will deny back pay for those years. However, plaintiff did actively seek employment in 1975 and there is no evidence that he was employed during that year or to date. In

its discretion, the Court shall award back pay from January 1, 1975 to date. Punitive damages and attorney's fees will be denied.

Accordingly, judgment shall be entered against plaintiff and for defendants Moye, Wheeler and Nelson. Judgment shall be entered for plaintiff and against the remaining defendants, and reinstatement and back pay at the appropriate hourly rate less all deductions defendants were required to make shall be ordered. Appropriate orders for the formulation of such a judgment shall be issued.

IT IS SO ORDERED.