560 F.2d 925
 George D. OWEN, Appellant,
v.
The CITY OF INDEPENDENCE, MISSOURI, Lyle W. Alberg, City
Manager, Richard A. King, Mayor, Charles E. Cornell, Dr. Ray
Williamson, Dr. Duane Holder, Ray A. Heady, Mitzi A.
Overman, and E. Lee Comer, Jr., Members of the Council of
the City of Independence, Missouri, Appellees.
George D. OWEN, Appellee,
v.
The CITY OF INDEPENDENCE, MISSOURI, Lyle W. Alberg, City
Manager, Richard A. King, Mayor, Charles E. Cornell, Dr. Ray
Williamson, Dr. Duane Holder, Ray A. Heady, Mitzi A.
Overman, and E. Lee Comer, Jr., Members of the Council of
the City of Independence, Missouri, Appellants.
 Nos. 76-1758, 76-1799.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 16, 1977.
Decided Aug. 15, 1977.
Rehearing and Rehearing En Banc Denied Sept. 26, 1977.
 
 Irving Achtenberg, Kansas City, Mo., for appellant.
 Richard G. Carlisle, Asst. City Counselor, Independence, Mo., for appellees; Thomas D. Cochran, Independence, Mo., on brief.
 Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 Following his discharge in April 1972 as chief of police of Independence, Missouri, appellant George D. Owen filed this civil action against the City of Independence, city manager Lyle W. Alberg, and the present members of the city council in their official capacities.[1] Owen seeks a declaration that his discharge violated his constitutional right to due process, and prays for a mandatory injunction reinstating[2] him as chief of police with backpay. After a bench trial, the district court held that Owen could assert a claim against the City and its council members in their official capacities arising directly from the fourteenth amendment under the general federal question jurisdiction statute, 28 U.S.C. § 1331, but the court denied Owen relief on the merits. Owen appeals. Appellees cross-appeal, asserting that the City and the individual defendants are not amenable to suit under 28 U.S.C. § 1331 and the fourteenth amendment. The district court opinion is reported at 421 F.Supp. 1110 (W.D.Mo.1976). For reasons stated below, we affirm on the City's cross-appeal and reverse and remand on Owen's appeal.
 
 
 2
 The district court's findings of fact, quoted in part below, furnish the background needed for understanding the issues presented here:
 
 
 3
 "I. Findings of Fact.
 
 
 4
 Plaintiff is, and at all times material was, a citizen of the United States and a resident of the State of Missouri.
 
 
 5
 Defendant City is a municipal corporation organized and existing under the laws of the State of Missouri. The City's government is organized in the council-manager form pursuant to a Missouri Constitutional Home Rule city charter adopted December 5, 1961, and amended April 4, 1972.
 
 
 6
 Defendant Lyle W. Alberg is the duly appointed and acting City Manager and Chief Administrative Officer of the City.
 
 
 7
 Defendant Richard A. King is the duly elected and acting Mayor of the City and a member of the City Council. He is the successor of Phil K. Weeks who was, on April 17, 1972, and prior thereto, the City's Mayor.
 
 
 8
 Defendants Charles E. Cornell, Dr. Ray Williamson, Dr. Duane Holder, Ray A. Heady, Mitzi A. Overman, and E. Lee Comer, Jr., are the duly elected and acting members of the City Council of the City. They are the successors of William A. McGraw, Lauzon H. Maxwell, Arthur W. Lamb, R. M. "Rudy" Bonville, Morris D. McQuinn and Paul L. Roberts who were the members of the City Council on April 17, 1972, and prior thereto.
 
 
 9
 Under Section 3.3(1) of the City's Charter, the City Manager is vested with the sole power to
 
 
 10
 '(a)ppoint, and when deemed necessary for the good of the service, lay off, suspend, demote, or remove all directors, or heads of administrative departments and all other administrative officers and employees of the city. . . .'
 
 
 11
 Plaintiff, as Chief of Police, was subject to this provision. The Charter did not provide that the Chief of Police was entitled to any notice of reasons, or a hearing, in connection with the termination of his employment.
 
 
 12
 The City Council, and its members, are prohibited from influencing, or interfering with in any manner, the City Manager's power of appointment and discharge of City employees. Section 2.11 of the City Charter provides that:
 
 
 13
 '(n)either the council, the mayor, nor any of its other members may direct the appointment of any person to, or his removal from office or employment by the city manager or by any other authority, or, except as provided in this charter, participate in any manner in the appointment or removal of officers and employees of the city. Except for the purpose of inquiry, the council, the mayor, and its other members shall deal with the administrative service solely through the city manager. . . . If the mayor or any other councilman violates any provision of this section, he shall be guilty of a misdemeanor, and upon conviction thereof, shall cease to be a councilman. . . .'
 
 
 14
 On February 20, 1967, plaintiff was appointed Chief of Police of the City for an indefinite term by then City Manager Robert L. Broucek. Prior to that time he had served as an assistant to the Chief of Police of Kansas City, Missouri. Plaintiff was given no contract of employment, and there was no de facto tenure system which would have given him a reasonable or legitimate expectation of continued employment. Plaintiff served as Chief of Police until his employment was terminated effective April 19, 1972, by notice in writing of April 18, 1972, by the present City Manager Lyle W. Alberg.
 
 
 15
 For a substantial period of time prior to March, 1972, plaintiff and City Manager Alberg had had several sharp disagreements over plaintiff's administration of the Police Department, including but not limited to plaintiff's choice of people for positions in the Department and his administration of the Police Department's property room. In early March, 1972, a handgun, which had been destroyed according to records of the Department's property room, was discovered in the hands of a felon by Kansas City, Missouri, police. In about mid-March, 1972, City Manager Alberg initiated an investigation of the property room of the Police Department initially under plaintiff's direction. Later in March, 1972, Alberg decided that the investigation should be conducted by an independent branch of the city government. He transferred the two police officers who had begun the investigation, Sergeant Robert Jackson and Detective William Reynolds, to the City's Department of Law; and directed City Counselor James S. Cottingham who was head of the Department of Law to supervise the conduct of the investigation and to report the findings of the investigation directly to him.
 
 
 16
 On or before April 12, 1972, City Manager Alberg received copies of statements of witnesses secured in the investigation, and reports from the City Auditor and City Counselor Cottingham. The City Auditor reported that there were insufficient records in the Police Department property room to make an adequate audit of the property in the property room. Cottingham reported in writing to Alberg that there was no evidence of any criminal acts, or violation of any state law or municipal ordinances, in the administration of the property room.
 
 
 17
 At an informal meeting with several of the City Council members, which took place on or before April 10, 1972, City Manager Alberg discussed the investigation and told the City Council members that he would take action at an appropriate time to correct any problems in administration of the Police Department disclosed by the investigation. At that time, Alberg intended to keep the witness statements and details of the findings of the investigation confidential.
 
 
 18
 On April 10, 1972, Alberg communicated by telephone with plaintiff, who was then on vacation in Las Vegas, Nevada. Alberg told plaintiff he was dissatisfied with plaintiff's job performance, and asked plaintiff to resign as Chief of Police and accept another position in the Police Department. He told plaintiff that if he refused to accept another position in the Department, he would be discharged. Plaintiff requested a personal conference with Alberg in Independence the following day.
 
 
 19
 On April 11, 1972, Alberg and plaintiff met in Alberg's office in Independence. Alberg stated to plaintiff that he was dissatisfied with plaintiff's administration of the Police Department, including plaintiff's lack of supervision over the records section of the Department; the state of those records; and plaintiff's inadequate administration, and lack of control, of the property room which had resulted in the reappearance of supposedly destroyed property in the hands of other people. Alberg again requested plaintiff to resign as Chief of Police, and to accept an advisory position with the Police Department. Plaintiff responded that he was not interested in another position, and that he would fight to remain Chief of Police. Alberg told plaintiff that if he continued to refuse to take another position, his employment with the City would be terminated.
 
 
 20
 On April 13, 1972, Alberg had a discussion with Lieutenant Lawrence L. Cook of the Police Department, during which he asked Cook if he would be willing to take the position of Chief of Police. Cook stated that he would. On the same day, Alberg released a public communication to the Mayor and City Council concerning the investigation and audit of the Police Department's property room, which stated:
 
 
 21
 "At my direction, the City Counselor's office, on conjunction with the City Auditor have completed a routine audit of the police property room.'Discrepancies were found in the administration, handling and security of recovered property. There appears to be no evidence to substantiate any allegations of a criminal nature.
 
 
 22
 'Steps have been initiated on an administrative level to correct these discrepancies.'
 
 
 23
 Alberg's statement was prominently reported by a local newspaper.
 
 
 24
 Alberg was away from Independence on the weekend of April 15 and 16, 1972. On April 15, he decided to replace plaintiff with Lieutenant Cook as Chief of Police. However, he did not inform anyone of his decision, and did not take formal action to implement his decision until April 18, 1972.
 
 
 25
 In Alberg's absence, Assistant City Manager Parley Banks became the Acting City Manager. During the weekend, City Councilman Paul L. Roberts requested copies of the reports of the audit and statements of witnesses secured in the investigation of the Police Department property room. Roberts had recently been defeated for re-election to the City Council, and his term was to expire following the meeting of the City Council on the evening of April 17, 1972. Banks, unaware of Alberg's intention to keep the details of the reports confidential, complied with Roberts' request and delivered the documents to Roberts without reading them.
 
 
 26
 During the weekend Roberts read the reports and unilaterally decided that their contents should be made public. He secretly drafted a statement to be made by him without prior notice to anyone, at the City Council meeting on the evening of April 17, 1972. The statement is described below.
 
 
 27
 An informal meeting was held on the morning of April 17, 1972, between Alberg and four members of the City Council, during which the investigation of the Police Department was again discussed. At that time, Alberg did not inform the council members of his intention to discharge plaintiff; and Councilman Roberts did not disclose his intention to make a statement concerning the investigation at the formal meeting of the City Council that evening.
 
 
 28
 On the evening of April 17, 1972, the City Council held a regularly scheduled meeting. The agenda of the meeting did not list a statement or motion by Councilman Roberts. After completion of the scheduled business, Councilman Roberts read his prepared statement. The statement alleged that plaintiff had taken two television sets from the property room of the Police Department for his own personal use; that numerous firearms in the custody of the Police Department had ' . . . found their way into the hands of others including undesirables . . .'; that narcotics being held by the Department ' . . . have mysteriously disappeared'; that traffic tickets had been manipulated; that inappropriate requests had been made by 'high ranking police officials to the police court'; ' . . . that things have occurred causing the unusual release of felons'; and the reports disclosed 'gross inefficiencies on the part of a few of the high ranking officers of the police department.' Councilman Roberts then moved that the reports be made public; that they be turned over to the Prosecuting Attorney of Jackson County; and that the City Council recommend to the City Manager
 
 
 29
 ' . . . that he should take all direct and appropriate action permitted under the Charter against such persons as are shown by the investigation to have been involved in illegal, wrongful, or gross inefficient activities brought out in the investigative reports, and to complete the investigation.'
 
 
 30
 * * * After discussion of Councilman Roberts' motion, six members of the Council voted to approve the motion. Councilman McGraw abstained from voting on the motion.
 
 
 31
 On April 18, 1972, City Manager Alberg implemented his prior decision to discharge plaintiff as Chief of Police. On that day plaintiff received a written notice from Alberg stating merely that his employment as Chief of Police was "(t)erminated under the provisions of Section 3.3(1) of the City Charter" effective April 19, 1972. Plaintiff requested that Alberg provide him with written notice of the reasons for the termination and a hearing in a letter to Alberg dated April 15, 1972. The letter was not received by Alberg until after plaintiff's discharge. Both the action of the City Council and plaintiff's discharge by City Manager Alberg were prominently reported in local newspapers.
 
 
 32
 After termination of plaintiff's employment, Alberg referred the investigation reports and statements to the Prosecuting Attorney of Jackson County, Missouri, for consideration by a grand jury as recommended by the City Council. The grand jury subsequently returned a "no true bill." Since that time, neither City Manager Alberg nor the City council made any further investigation of plaintiff's administration of the Police Department.
 
 
 33
 In April 1972, plaintiff's attorney requested a hearing on the reasons for plaintiff's discharge. The request was denied by Assistant City Counselor James L. Gillham by a letter to plaintiff's counsel dated May 3, 1972. (Owen v. City of Independence, Mo., 421 F.Supp. 1110, 1113-17 (W.D.Mo.1976).)"
 
 
 34
 The district court found no causal relationship between councilman Roberts' statement, as supported by the city council's resolution, and the termination of Owen's employment. The record shows, and the district court found, that city manager Alberg did not subscribe to Roberts' accusations and that Alberg publicly stated in his April 13, 1972, report to the city council that, although the investigation uncovered evidence of inefficiency in administration of the police department, no evidence of any criminal activity existed.
 
 
 35
 The district court also found that when Owen was discharged neither the members of the city council nor the city manager knew that a municipal employee discharged in the face of allegations of improper or immoral conduct was entitled to receive notice of the reasons for discharge and an opportunity to clear his name at a hearing.[3]
 
 
 36
 Owen did not join former councilman Roberts in this lawsuit. He did, however, bring an action in the Missouri courts seeking damages for defamation against Roberts and city manager Alberg in their individual capacities. Owen settled and dismissed his case against Roberts, and thereafter also dismissed the state suit against Alberg.
 
 
 37
 The federal district court determined that Owen's procedural due process claims against the City and its officials for their failure to give Owen a hearing on his discharge could rest directly upon the fourteenth amendment and that Owen could bring such an action in federal court against the City of Independence and its officials in their official capacities under 28 U.S.C. § 1331. The district court determined, however, that the discharge deprived Owen of no property interest in his job because he was an untenured employee, and that the action of the City in discharging Owen did not so stigmatize him as to deprive him of "liberty" protected by the fourteenth amendment. As an alternative ground for denying Owen relief, the district court ruled that the City could assert a qualified immunity based on the good faith exercised by its officials in denying Owen a hearing.[4] The district court found that the City had established this defense because, as we have already noted, on the date of Owen's discharge neither the city manager nor the members of the city council knew that the chief of police, an untenured administrative official of the City, possessed any right to a statement of reasons for his discharge and an opportunity for a hearing to clear his name.
 
 
 38
 The parties present these issues on appeal:
 
 By appellees:
 
 39
 1) That 28 U.S.C. § 1331[5] does not support a claim against the City of Independence and its officials in their official capacities arising directly from the Constitution.[6]
 
 By appellant:
 
 40
 2) That the district court erred in ruling that Owen's discharge did not deprive him of a liberty interest without an opportunity for hearing.
 
 
 41
 3) That the trial court erred in determining that Owen possessed no job tenure rights under Missouri law and thus suffered no deprivation of property when discharged.
 
 
 42
 4) That the trial court erred in applying a good faith defense to claims against the City and its agents in their official capacities. In this regard, appellant particularly notes that good faith does not bar equitable relief which ordinarily includes backpay as an incident of reinstatement.
 
 
 43
 We turn to a consideration of these issues.
 
 
 44
 I. Right of Action Against the City.
 
 
 45
 Assuming a constitutional violation, the City and its agents in their official capacities contend that federal law precludes any monetary award which must be satisfied by the City.
 
 
 46
 Although Owen's complaint alleges jurisdiction under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983 (as well as 28 U.S.C. § 1331), it is clear that no action lies against the municipality under sections 1343(3) and (4) and 1983, because the City is not a "person" within the meaning of section 1983. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Owen asserts, however, that his claim to retrospective monetary relief is not barred under either of two theories: (1) the individual defendants, in their official capacities, may be ordered under section 1983 to grant Owen a hearing and backpay from city funds under their control; or (2) the City is subject to suit for reinstatement and backpay under an implied right of action arising directly from the fourteenth amendment, and the district court possessed subject matter jurisdiction over that claim under 28 U.S.C. § 1331.
 
 
 47
 The individual defendants are, both in their official and individual capacities, "persons" under section 1983, subject to federal suits in equity to remedy unconstitutional behavior. It is also true that in section 1983 actions against government administrators, monetary relief in the form of backpay to be awarded from public funds under the defendants' control may be awarded as part of an equitable decree. See, e. g., Wellner v. Minnesota State Junior College Board, 487 F.2d 153, 156-57 (8th Cir. 1973); Cooley v. Board of Education of Forrest City School Dist., 453 F.2d 282 (8th Cir. 1972). Owen argues that he may recover backpay from the individual appellees in their official capacities as part of general equitable relief, even though the backpay award would be paid by the City, which could not be held directly liable for backpay under section 1983, because it is not a "person" within the meaning of section 1983. This position has some support. See, e. g., Lytle v. Commissioners of Election of Union County, 541 F.2d 421, 426 (4th Cir. 1976), pet. for cert. filed, 44 U.S.L.W. 3739 (U.S. June 22, 1976); Burt v. Board of Trustees of Edgefield County School Dist., 521 F.2d 1201, 1205-06 (4th Cir. 1975); Incarcerated Men of Allen County Jail v. Fair, 507 F.2d 281, 288 (6th Cir. 1974); Dyson v. Lavery, 417 F.Supp. 103, 109 (E.D.Va.1976); Adamian v. University of Nevada, 359 F.Supp. 825 (D.Nev.1973), rev'd on other grounds sub nom. Adamian v. Jacobsen, 523 F.2d 929 (9th Cir. 1975); Developments in the Law: Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1197-99 (1977).
 
 
 48
 Other courts have rejected this theory, however. They argue that a monetary award under section 1983, even if made part of equitable relief ordered in a suit against a city official, is really a judgment against the city, if the award is to be satisfied from city funds, and is therefore barred by City of Kenosha v. Bruno, supra, and Monroe v. Pape, supra. These cases draw an analogy to Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which held that a request for retroactive welfare benefits, even if entitled "equitable restitution" and made part of an equitable decree in a suit against a state official, is in reality a suit against the state barred by the eleventh amendment if the retroactive benefits are to be paid from the state treasury. See, e. g., Monell v. Department of Social Services of City of New York, 532 F.2d 259, 264-67 (2d Cir. 1976), cert. granted, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977); Muzquiz v. City of San Antonio, 528 F.2d 499 (5th Cir. 1976) (en banc ), pet. for cert. filed, 44 U.S.L.W. 3703 (U.S. May 23, 1976) (No. 75-1723); Patton v. Conrad Area School Dist., 388 F.Supp. 410 (D.Del.1975).[7] This analogy is criticized in Developments in the Law: Section 1983 and Federalism, supra, 90 Harv.L.Rev. at 1198-99.
 
 
 49
 However, we need not choose between the conflicting approaches to Owen's claims that he may obtain monetary relief from the City through the individual city officials in their official capacities under section 1983, because we are convinced that Owen has established a claim on his second theory, that of an implied right of action arising from the Constitution itself.
 
 
 50
 Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), clearly recognized that a federal "court of law vested with jurisdiction over the subject matter of a suit has the power and therefore the duty to make principled choices among traditional judicial remedies" to vindicate rights arising from positive law, such as the Constitution, without express congressional authorization. 403 U.S. at 408 n.8, 91 S.Ct. at 2011 (Harlan, J., concurring). We are confronted with the fundamental questions of whether the remedies Owen seeks against the City of Independence are available as "necessary" or "appropriate" to the vindication of fourteenth amendment values, see Bivens, supra, 403 U.S. at 397, 191 S.Ct. 1999, 2011; id. at 406, 91 S.Ct. 1999 (Harlan, J., concurring), and whether Congress has expressly decided that a person injured by a municipal violation of the Constitution may not recover money from the city but must be limited to remedies against others specifically provided by Congress, Bivens, supra, 403 U.S. at 397, 91 S.Ct. 1999.
 
 
 51
 Some courts have held that municipal immunity from suit under section 1983 necessarily indicates that Congress intended to immunize local government units from monetary liability under 28 U.S.C. § 1331 and the fourteenth amendment. See, e. g., Raffety v. Prince George's County, 423 F.Supp. 1045 (D.Md.1976); Farnsworth v. Orem City, 421 F.Supp. 830 (D.Utah 1976); Pitrone v. Mercadante, 420 F.Supp. 1384 (E.D.Pa.1976); Turano v. Board of Educ. of Island Trees Union Free School Dist. No. 26, 411 F.Supp. 205 (E.D.N.Y.1976); Mitchell v. Libby, 409 F.Supp. 1098 (D.Vt.1976); Snead v. Department of Social Services of City of N. Y., 409 F.Supp. 995, 1001-02 (S.D.N.Y.1975) (three-judge court) (Mulligan, J., concurring); Weathers v. West Yuma County School Dist. R-J-1, 387 F.Supp. 552 (D.Colo.1974), aff'd, 530 F.2d 1335 (10th Cir. 1976); Smetanka v. Borough of Ambridge, 378 F.Supp. 1366 (W.D.Pa.1974); Perzanowski v. Salvio, 369 F.Supp. 223 (D.Conn.1974). The Supreme Court has not expressly resolved the issue. See, e. g., Mt. Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977); Aldinger v. Howard, 427 U.S. 1, 4 n.3, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). However, the Supreme Court may well have already rejected local governmental immunity under section 1983 as a basis for disallowing an implied right of action against local governments under the fourteenth amendment. In City of Kenosha v. Bruno, supra, the Supreme Court held that section 1983 does not permit equitable relief against a city, but remanded the case to the district court to determine whether the prerequisites for general federal question jurisdiction under 28 U.S.C. § 1331 were met and for reconsideration of the merits in light of several intervening decisions. See 412 U.S. at 514, 515, 93 S.Ct. 2222. Against the City of Kenosha, the issues on the merits could only be considered if there were an implied right of action against the city, because relief was unavailable under section 1983. The Supreme Court apparently did not view section 1983 as limiting the power of federal courts to imply remedies from the Constitution against a municipal corporation such as the City of Kenosha. See City of Kenosha v. Bruno, supra, 412 U.S. at 516, 93 S.Ct. 2222 (Brennan, J., concurring); Hostrop v. Board of Junior College District No. 515, 523 F.2d 569, 577 (7th Cir. 1975), cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); Dahl v. City of Palo Alto, 372 F.Supp. 647, 650 (N.D.Cal.1974); Note, Damage Remedies Against Municipalities For Constitutional Violations, 89 Harv.L.Rev. 922, 941-42 (1976) (hereafter cited as Note, Damage Remedies ). But see Pitrone v. Mercadante, 420 F.Supp. 1384, 1388 (E.D.Pa.1976).
 
 
 52
 The majority of those courts considering these issues have concluded that monetary relief such as backpay may be awarded against local governmental entities on a Bivens theory, even though those governmental units are immune from section 1983 liability, and that such a remedy is an appropriate one to vindicate constitutional rights in proper cases.[8] We agree with the majority and affirm the district court on this issue, 421 F.Supp. at 1119, that Owen may assert a claim for monetary relief under the fourteenth amendment against the City of Independence.[9] See Stapp v. Avoyelles Parish School Bd., 545 F.2d 527, 531 n. 7 (5th Cir. 1977); Amen v. City of Dearborn, 532 F.2d 554, 559 (6th Cir. 1976); Reeves v. City of Jackson, Miss., 532 F.2d 491, 495 (5th Cir. 1976); Cox v. Stanton, 529 F.2d 47 (4th Cir. 1975); Brault v. Town of Milton, 527 F.2d 730 (2d Cir.), rev'd on other grounds, id. at 736 (2d Cir. 1975) (en banc ); Hostrop v. Board of Junior College District No. 515, supra, 523 F.2d 569; Gray v. Union County Intermediate Education District, 520 F.2d 803, 805 (9th Cir. 1975); Calvin v. Conlisk, 520 F.2d 1 (7th Cir. 1975), vacated and remanded on other grounds, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307, cert. denied sub nom. Afro-American Patrolmen's League v. Conlisk, 424 U.S. 912, 96 S.Ct. 1109, 47 L.Ed.2d 316 (1976); Hanna v. Drobnick, 514 F.2d 393 (6th Cir. 1975); Skehan v. Board of Trustees of Bloomsburg State College, 501 F.2d 31, 41-44 (3d Cir. 1974), vacated and remanded on other grounds, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); Adekalu v. New York City, 431 F.Supp. 812 (S.D.N.Y.1977); Sedule v. Capital School Dist., 425 F.Supp. 552 (D.Del.1976); Sanabria v. Village of Monticello, 424 F.Supp. 402 (S.D.N.Y.1976); Sixth Camden Corp. v. Township of Evesham, 420 F.Supp. 709 (D.N.J.1976); Behan v. City of Dover, 419 F.Supp. 562 (D.Del.1976); Sheets v. Stanley Community School Dist. No. 2, 413 F.Supp. 350, 351 (D.N.D.1975), aff'd, 532 F.2d 111 (8th Cir. 1976); Demkowicz v. Endry, 411 F.Supp. 1184 (S.D.Ohio 1975); Collum v. Yurkovich, 409 F.Supp. 557 (N.D.Ill.1975); Panzarella v. Boyle, 406 F.Supp. 787 (D.R.I.1975); Williams v. Brown, 398 F.Supp. 155 (N.D.Ill.1975); Everett v. City of Chester, 391 F.Supp. 26 (E.D.Pa.1975); Dahl v. City of Palo Alto, 372 F.Supp. 647 (N.D.Cal.1974).
 
 
 53
 The City also suggests in its brief that the Missouri rule of sovereign immunity for municipalities shields it from liability. The short answer to this contention is that this case presents a federal question in which state law does not control. As indicated in our discussion of remedies, infra, backpay is an appropriate remedy to vindicate the federal rights of illegally discharged public employees such as Owen, and contrary state immunity defenses cannot, consistent with the Supremacy Clause, protect the City. Hampton v. City of Chicago, 484 F.2d 602, 607 (7th Cir. 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938, 972, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); Maybanks v. Ingraham, 378 F.Supp. 913, 916 n. 2 (E.D.Pa.1974); Note, Damage Remedies, supra, 89 Harv.L.Rev. at 955-56.
 
 
 54
 II. The Liberty Interest.
 
 
 55
 Despite the obviously derogatory and stigmatizing nature of Roberts' statement on April 17, 1972 (one day preceding the actual discharge), the district court held that Owen had not been deprived of a constitutionally protected interest in liberty,[10] relying on three arguments. First, the district court reasoned that the only official reason given for Owen's discharge by the city manager, the official with sole power to discharge the chief of police, was that Owen was "(t)erminated under the provisions of Section 3.3(1) of the City Charter(,)" which provided for discharge merely for the "good of the service." Thus, according to the district court, there exist no statements in Owen's official record which could possibly stigmatize Owen. 421 F.Supp. at 1121.
 
 
 56
 Secondly, the district court determined that there was no "causal connection" between Owen's discharge and the statement made by councilman Roberts and the actions taken by the city council. The court pointed out that before the council meeting of April 17, 1972, city manager Alberg had already decided to discharge Owen. Moreover, the city council and its members were prohibited by the city charter from attempting to influence the city manager's decision regarding hiring and firing of employees. See 421 F.Supp. at 1121.
 
 
 57
 Thirdly, the district court reasoned, 421 F.Supp. at 1121-22, that Owen was completely exonerated from any charges of criminal or immoral conduct by the city counselor's and city manager's pre-April 17th statements that the investigation had uncovered no evidence of illegal conduct in the police department, and by the county grand jury's subsequent return of a "no true bill."
 
 
 58
 We disagree. In determining whether a government employer has deprived its employee of a liberty interest in the termination of employment, the crucial issue is whether the government employer, in connection with the termination of government employment, including a refusal to rehire or reemploy, makes a charge which might seriously damage the employee's standing and reputation in the community. Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 270, 33 L.Ed.2d 548 (1972). Compare Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); Paul v. Davis, 424 U.S. 693, 708-710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).
 
 
 59
 The elements of a claim for deprivation of liberty on the part of a public employee, first enunciated by the Court in Roth, have been clarified in Bishop and Codd, as well as in the related case of Paul v. Davis, supra. In Bishop, supra, the city manager on recommendation of the police chief discharged a policeman for reasons of conduct "unsuited to an officer." 426 U.S. at 343, 96 S.Ct. 2074. In addressing the liberty claim, Mr. Justice Stevens, writing for the majority, made reference to the elements necessary to establish the claim, i. e., that the reasons given for the discharge may severely damage the employee's reputation in the community and that the employee claims those reasons were false. Id. at 347, 96 S.Ct. 2074. In that case, petitioner could not establish his right to recovery because the city did not publicly disclose the asserted reasons for the discharge decision.
 
 
 60
 In Codd v. Velger, supra, Velger complained that he had been wrongly dismissed as a New York City policeman without a hearing or statement of reasons. A potential employer in examining Velger's personnel file " 'gleaned that plaintiff (Velger) had been dismissed because while still a trainee he had put a revolver to his head in an apparent suicide attempt.' " 429 U.S. at 626, 97 S.Ct. at 883, quoting the findings of the district court. The Court held that policeman Velger did not state a claim because the record disclosed that he had failed to allege the falsity of the stated reasons for the dismissal. Thus, a hearing could not clear his name.
 
 The Velger Court explained as follows:
 
 61
 Assuming all of the other elements necessary to make out a claim of stigmatization under Roth and Bishop, the remedy mandated by the Due Process Clause of the Fourteenth Amendment is "an opportunity to refute the charge." 408 U.S., at 573, 92 S.Ct. at 2707. "The purpose of such notice and hearing is to provide the person an opportunity to clear his name," id., n. 12. But if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation.
 
 
 62
 But the hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely "to provide the person an opportunity to clear his name." If he does not challenge the substantial truth of the material in question, no hearing would afford a promise of achieving that result for him. For the contemplated hearing does not embrace any determination analogous to the "second step" of the parole revocation proceeding, which would in effect be a determination of whether or not, conceding that the report were true, the employee was properly refused re-employment. Since the District Court found that respondent had no Fourteenth Amendment property interest in continued employment, the adequacy or even the existence of reasons for failing to rehire him presents no federal constitutional question. Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required. Roth, supra; Bishop, supra. (Id. at 627-28, 97 S.Ct. at 883-84 (footnote omitted).)
 
 
 63
 In Paul v. Davis, supra, Davis complained that a defamatory flyer issued by the chief of police of Louisville, naming Davis as an active shoplifter, deprived the complainant of "liberty" or "property" secured against state deprivation by the Due Process Clause. The Court, although rejecting the claim that an interest in one's reputation alone is protected by the Due Process Clause, reaffirmed its decision in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), with the following language:
 
 
 64
 Thus it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment. Certainly there is no suggestion in Roth to indicate that a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee. (424 U.S. at 710, 96 S.Ct. at 1165 (emphasis added).)
 
 
 65
 The district court in finding no stigma focused upon the nondefamatory legal justification for Owen's discharge given by the city manager in the discharge notice. That notice by itself did not cast a stigma upon Owen. But Roberts, in his capacity as a city councilman, released to the public and to the press a statement impugning Owen's honesty and integrity. This statement, allegedly false, was made at an official meeting of the city council. The city council itself appeared to lend support to Roberts' charges by resolving that the investigative reports be referred to the county prosecutor for presentation to the grand jury. Newspapers prominently reported Roberts' statement and the city council resolution. Owen's discharge followed immediately after the April 17, 1972 meeting. The city manager notified Owen of his discharge, citing no reasons for the discharge, but referring only to provisions of section 3.3(1) of the city charter. The fact of the discharge, Roberts' statement, and the council action received great publicity, and the newspapers linked the discharge to the investigation.[11]
 
 
 66
 The fact of actual stigma to Owen connected with his discharge is undeniable, for the action of the City of Independence as employer served to blacken Owen's name and reputation. That the stigmatizing charges did not come from the city manager and were not included in the discharge notice is immaterial, because the official actions of the city council released charges against Owen contemporaneous and, in the eyes of the public, connected with that discharge. It is the fact of the City's public accusation which is of prime importance, not which official made the accusation. See Cox v. Northern Virginia Transportation Commission, 551 F.2d 555, 558 (4th Cir. 1976); Churchwell v. United States, 545 F.2d 59 (8th Cir. 1976); Greenhill v. Bailey, 519 F.2d 5 (8th Cir. 1975); Birnbaum v. Trussell, 371 F.2d 672 (2d Cir. 1966).
 
 
 67
 Finally, the secret deliberations of a grand jury cannot be deemed exoneration for one stigmatized in his employment or the equivalent to the due process right of an employee subject to dismissal to attempt to "clear his name" in hearings which can be open to the public. See Codd v. Velger, 429 U.S. at 627-28, 97 S.Ct. at 883-84.
 
 
 68
 Accordingly, we hold that the action of the City of Independence deprived Owen of liberty without due process of law, in violation of Owen's rights under the fourteenth amendment.
 
 
 69
 III. Property Interest.
 
 
 70
 The city charter of Independence provides in section 3.3(1) that a department head, such as the chief of police, may be removed by the city manager only "when deemed necessary for the good of the service." Owen contends here, as he did in the district court, that this city charter provision granted him a continuing contract as police chief, subject only to termination for cause. Therefore, he claims the protections of procedural due process in termination. The city charter makes no express provision for a termination hearing for department heads, but it also does not expressly deny that right.
 
 
 71
 Appellant relies principally on Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In that case, a federal employee, Kennedy, attacked the discharge procedures under the Lloyd-LaFollette Act, 5 U.S.C. § 7501, and attendant regulations, which did not extend to nonprobationary federal employees such as Kennedy the right to a full trial-type hearing before removal. Although the Supreme Court in a divided series of opinions rejected Kennedy's claim, six of the nine justices agreed that Kennedy's government employment was one which could be terminated only for cause, i. e., "such cause as will promote the efficiency of the service," 5 U.S.C. § 7501(a), and that such statutory language created a property interest in employment, entitling the employee to some form of a due process hearing prior to discharge.
 
 
 72
 Subsequently, in Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court considered the case of a Marion, North Carolina, police officer, who was classified as a permanent employee and covered by provisions of an ordinance which specified that an employee might be discharged if he failed "to perform work up to the standard of the classification held, or continues to be negligent, inefficient, or unfit to perform his duties * * *." Id. at 344 n. 5, 96 S.Ct. at 2077. The Court rejected Bishop's claims to a property interest in his job because North Carolina precedent supported the lower court's conclusion that, despite the language of the ordinance quoted above, that ordinance granted no right to continued employment, but merely conditioned an employee's removal upon compliance with certain specified procedures. Id. at 345, 96 S.Ct. 2074. Thus, Bishop teaches that the Supreme Court's interpretation of a federal statute does not control the interpretation of similarly worded state laws.
 
 
 73
 While some of the Missouri cases which interpret statutes allowing discharge of public employees "for the good of the service," appear to support Owen's position, see State ex rel. Reid v. Walbridge, 119 Mo. 383, 24 S.W. 457 (1893); State ex rel. Denison v. City of St. Louis, 90 Mo. 19, 1 S.W. 757 (1886); State ex rel. Eckles v. Kansas City, 257 S.W. 197, 200-01 (Mo.App.1923); see also Friedman v. Miller, 525 S.W.2d 770, 772 (Mo.App.1975), the state supreme court's opinion in State v. Crandall, 269 Mo. 44, 190 S.W. 889 (1916) (en banc ) supports the position of the appellee that Owen possessed no property interest in his job. The state court there said:
 
 
 74
 (W)here the power to remove is given, expressly or by necessary implication, in the Enabling Act, by words or terms denoting that it may be exercised in discretion, such power, to the extent thus given, is ex hypothesi, one which may be exercised whenever in the mind and judgment of the donee of the power the fact or thing exists upon which his discretion is rested. In the case at bar the statute in express terms tells the Governor to remove any commissioner "upon his being fully satisfied" of "the alleged official misconduct" of such commissioner. It therefore falls within the exact terms of the proposition last stated * * *. (190 S.W. at 891.)
 
 
 75
 The provision of the charter which authorizes the city manager to "(a)ppoint, and when deemed necessary for the good of the service * * * remove all directors or heads of administrative departments" may be fairly interpreted as conferring upon the city manager the power to remove such officers at will. (Emphasis added). The city manager's power to discharge seems analogous to that of the governor in Crandall, who could discharge "upon his being fully satisfied" that there was misconduct. Under Missouri law, such language confers the power to discharge at will.
 
 
 76
 The district court determined that under the home rule provisions of the Missouri Constitution, the applicable law is the charter of the City of Independence. The court construed that charter not to provide rights to a notice and hearing for an employee who is an administrative department head such as Owen, and responded to appellant's argument that he was entitled to a hearing with this language:
 
 
 77
 Plaintiff argues that in spite of the fact that heads of administrative departments are not expressly accorded rights to notice and a hearing, such rights are to be implied from the fact that heads of administrative departments were made dischargeable only "when necessary for the good of the service." However, from Sections 3.28 and 3.1 of the Charter, it is clear that the drafters of the Charter knew how to expressly provide for rights to notice and a hearing when such rights were intended. In view of the express provision of such rights to other employees, it is unlikely that the drafters intended to accord heads of administrative departments such rights by implication through use of the phrase "for the good of the service." Rather the absence of an express provision of such rights is persuasive evidence that no such rights were intended to exist. (421 F.Supp. at 1125.)
 
 
 78
 We can find no specific Missouri case law to the contrary. While the question is one not entirely free from doubt, under these circumstances we are required to give great weight to the views of the district judge, who is familiar with the local law. See Merchants Mutual Bonding Co. v. Appalachian Ins. Co., 556 F.2d 899 (8th Cir., 1977); Rodeway Inns of America, Inc. v. Frank, 541 F.2d 759, 767 (8th Cir. 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); Luke v. American Family Mut. Ins. Co., 476 F.2d 1015 (8th Cir.) (en banc ), cert. denied, 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973).
 
 
 79
 Accordingly, we reject Owen's contention that he possessed a property interest in continued employment as chief of police of the City of Independence.IV. Remedy.
 
 
 80
 We held in Wellner v. Minnesota State Jr. College, 487 F.2d 153 (8th Cir. 1973), that when an untenured employee of a state agency is, upon discharge, stigmatized by the release of defamatory information by his employer and denied the right to clear his name in a public hearing, that employee is entitled to a judgment including lost wages, but not actual reinstatement.[12] In that case we said:
 
 
 81
 Wellner (the state employee) was improperly discharged because he was not accorded an appropriate hearing. His termination was therefore a nullity and he remains on the payroll until a proper hearing is held, at which time he may be retained or not reappointed. It is not within our province to speculate that after a proper hearing clearing his reputation the Board will recommend that Wellner not be reappointed, or that the appropriate official will not reappoint him to a similar teaching position. In any event, Wellner remains on the payroll and is entitled to receive the wages he will have earned until his name is cleared by proper Board action and the decision is properly made with respect to whether he will be reappointed. (487 F.2d at 157.)
 
 
 82
 As we have noted, Owen's age bars him from qualifying to serve further as chief of police, so vindication of his good name could not restore Owen to this job at this time. Moreover, in light of the findings by the district court that the city manager, prior to April 17, 1972, had decided to discharge plaintiff for reasons which apparently did not relate to Owen's honesty or integrity, a full backpay remedy would afford Owen a windfall at the expense of the municipality and the municipal taxpayers. A person deprived of constitutional rights by the Government is entitled to relief only to the extent of the harm sustained, Codd v. Velger, supra, 429 U.S. at 628, 97 S.Ct. at 884; to the extent that the constitutional violation causes no injury, no remedy is called for, Mt. Healthy City School District v. Doyle, supra, 429 U.S. at 285, 97 S.Ct. at 575. Thus, in its remedial aspects, this case can be distinguished from Wellner, for there one could not say whether or not the discharged employee would have retained his job after a public hearing.
 
 
 83
 However, merely to order that the City now give Owen a hearing would amount to no relief at all. Although Owen would not have remained chief of police even after a hearing, it seems likely that he was still employable in the law enforcement field and that Roberts' charges adversely affected Owen's employability. The record discloses that the city manager did offer Owen a different position with the City when Owen's resignation was demanded. In addition, he did work at some other security jobs during the period between his discharge and the time when he would have retired. However, the record shows that Owen sought other similar employment opportunities and that at least one such opportunity was denied him because of the adverse publicity surrounding his discharge. We believe some amount of compensatory relief is appropriate here. The present record[13] can furnish an adequate basis for the district court to determine the proper amount of compensation, measured by the amount of money he likely would have earned to retirement if he had not been deprived of his good name by the action of the City, subject to mitigation, including the amounts earned up to retirement age as well as the amount, if any, recovered from councilman Roberts in the state defamation suit.
 
 
 84
 The award against the municipality here, while not strictly backpay, is in lieu of backpay and represents a form of equitable relief, because, as explained in the Wellner case, Owen's termination without an appropriate hearing must be deemed a nullity; he remains on the payroll and is entitled to backpay. As we have noted, however, he is not entitled to a windfall.
 
 
 85
 V. Good Faith Defense.
 
 
 86
 The good faith of the municipality does not constitute a defense to exaction of monetary relief as an element of equitable relief. Backpay has been often considered an incident to equitable relief. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 48, 57 S.Ct. 615, 81 L.Ed. 893 (1937); Harkless v. Sweeny Independent School Dist., 427 F.2d 319, 324 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).
 
 
 87
 In making available to the City the defense of good faith, the district court relied on the elements of that defense applied in section 1983 actions for damages against state officials, as enunciated in Wood v. Strickland, 420 U.S. 308, 319-21, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and Scheuer v. Rhodes, 416 U.S. 232, 241-42, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Wood v. Strickland notes that "immunity from damages does not ordinarily bar equitable relief as well." 420 U.S. at 314-15 n. 6, 95 S.Ct. at 997. To the extent that backpay or a lesser equivalent qualifies as equitable relief, the immunity ruling of the Wood case ought not to apply.
 
 
 88
 Moreover, the primary justification for the defense of good faith in Wood, to insure that public officials will not hesitate to discharge their duties out of fear of personal monetary liability, see 420 U.S. at 319-21, 95 S.Ct. 992, does not exist where the city itself will bear the monetary award. In Hander v. San Jacinto Junior College, 5 Cir., 519 F.2d 273, rehearing denied, 522 F.2d 204 (5th Cir. 1975), which involved an illegally discharged college professor, the court refused to apply the immunity rule of Wood v. Strickland, stating:
 
 
 89
 The Wood rationale, however, is inapplicable to the instant case because the backpay award is entered against San Jacinto Junior College itself and not against the individual members of the Board of Regents. (519 F.2d at 277 n. 1.)
 
 
 90
 See also Developments in the Law: Section 1983 and Federalism, supra, 90 Harv.L.Rev. at 1217-20; Note, Damage Remedies, 89 Harv.L.Rev. at 955-58.
 
 
 91
 In addition to the Wellner case previously cited, this court in Cooley v. Board of Educ. of Forrest City School Dist., 453 F.2d 282, 287 (8th Cir. 1972), awarded backpay against a school board in favor of an unconstitutionally discharged schoolteacher. Although Wellner and Cooley arose under section 1983, the backpay liability was assessed against the school officials in their official capacities and constituted an obligation of the school districts themselves, not the individual defendants. If equitable relief will be against a school board without regard to the board's good faith as it did in Wellner and Cooley, we perceive no reason to extend a qualified good faith immunity to a city which has inflicted similar injury to an employee's reputation in the course of discharging that employee.
 
 
 92
 Whether good faith may be a defense to a municipality in an action for damages apart and aside from backpay or its equivalent, see, e. g., Hostrop v. Board of Junior College Dist. No. 515, 523 F.2d 569, 579 (7th Cir. 1975), cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976) (damages for violation of intangible constitutional rights) is a matter which we do not address in this opinion.
 
 
 93
 Finally, in determining that the city officials acted in good faith, the district court focused upon the City's failure to give Owen a hearing. The city manager and the members of the city council, except councilman Roberts, all testified and asserted that they did not know in April 1972, that an employee in Owen's position was entitled to a hearing, and testified further that their actions arose from a good faith belief that the public was entitled to know the results of the investigation. The fact of the matter is that the results of the investigation were never made public. Councilman Roberts, however, made statements at an official meeting of the city council implying that the investigation showed the chief of police to have been guilty of criminal conduct, without giving the accused person an opportunity to respond or to defend himself. It is Roberts' allegedly false accusation which damaged Owen's reputation and future employment prospects. The city officials may have acted in good faith in refusing the hearing, but lack of good faith is evidenced by the nature of the unfair attack made upon the appellant by Roberts in the official conduct of the City's business. The district court did not address the good faith defense in light of Roberts' defamatory remarks.
 
 
 94
 In any event, however, we hold the good faith defense unavailable as a matter of law in cases involving claims for backpay and similar equitable remedies which will be borne by a unit of government and not individual office holders.
 
 
 95
 VI. Conclusion.
 
 
 96
 It follows from the foregoing discussion that, in addition to some compensatory relief, Owen is entitled to a declaratory judgment that his discharge from employment deprived him of constitutionally protected liberty without due process of law.
 
 
 97
 Accordingly, we reverse the judgment and remand this case to the district court for entry of the declaratory judgment and an award of compensatory relief consistent with this opinion.
 
 
 98
 VAN OOSTERHOUT, Senior Circuit Judge, dissenting.
 
 
 99
 The issue of whether an action against a city and its officers can be instituted directly under the fourteenth amendment and 28 U.S.C. § 1331 is a close one on which, as noted by the majority, the courts are divided. The issue is one which "has never been decided by (the Supreme Court)." Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). Since in my opinion plaintiff cannot recover on the merits, I will assume for the purpose of this case, without so concluding, that the majority has correctly resolved this issue. I accordingly do not dissent from the dismissal of the cross-appeal.
 
 
 100
 I agree with the majority that the plaintiff was an untenured employee and that he had no property interest in his position.
 
 
 101
 My point of departure is on the majority's holding that plaintiff was deprived of a liberty interest without a hearing and in particular on the majority's conclusion that the stigma to Owen was "connected with his discharge." That this conclusion is essential to the result reached by the majority is clear. In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), city police had furnished a list of shoplifters to local merchants for the purpose of assisting them in preventing shoplifting. Plaintiff, whose name appeared on the list, had been charged with shoplifting but had not been tried when the list was provided. On the liberty issue the Court holds:
 
 
 102
 The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.
 
 
 103
 While not uniform in their treatment of the subject, we think that the weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.
 
 
 104
 Thus it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment.
 
 
 105
 Id. at 701, 702, 710, 96 S.Ct. at 1160, 1161, 1165.
 
 
 106
 As set out in the trial court's findings of fact incorporated in the majority opinion, the city manager had exclusive jurisdiction to hire and fire city employees. The chief of police was subject to this provision. The city charter specifically prohibits the mayor or council from interfering with the appointment or discharge of any officer, such as the chief of police. Violation constitutes a misdemeanor and grounds for removal from office upon conviction.
 
 
 107
 On April 10, 1972, the city manager, being dissatisfied with the work of the police chief, requested the chief to resign and accept another position in the police department, which plaintiff refused to do. On April 13, the city manager obtained the consent of one Cook to serve as police chief. On April 18, plaintiff was formally advised of his discharge.
 
 
 108
 The majority agrees with the district court's determination that no stigma attached to the nondefamatory discharge notice given by the city manager. The defamation made was contained in information released by councilman Roberts at an April 17 council meeting. Neither the mayor nor the council had any voice in plaintiff's discharge. Plaintiff had been fully advised on April 10 and 11 that he would be discharged if he did not resign and arrangements for a successor were made on April 13 by the city manager, all prior to the April 17 council meeting.
 
 
 109
 I readily acknowledge that "official actions of the city council released charges against Owen contemporaneous and, in the eyes of the public, connected with that discharge." Majority opinion, supra at 937. While this fact might have some bearing on the amount of damages recoverable in a state action for defamation, I cannot agree that it somehow creates an otherwise absent liberty interest entitling plaintiff to a hearing. It is clear that the public impression gleaned from media reports did not conform to the true situation, for the only official charged with responsibility to discharge, the city manager, made no stigmatizing allegation. Nor was he in any way responsible for the mistaken impression gained by the public. Cf. Cox v. Northern Virginia Transportation Commission, 551 F.2d 555, 558 (4th Cir. 1976). Since nothing in the discharge process itself cast a stigma upon plaintiff, Paul v. Davis is, in my opinion, controlling.
 
 
 110
 I agree with the trial court's determination that there is no causal connection between plaintiff's discharge by the city manager and the statements of Roberts at the council proceedings. Such determination is supported by substantial evidence and is not clearly erroneous under the authorities heretofore cited. No violation of plaintiff's liberty rights in connection with his discharge has been established.
 
 
 111
 I find it unnecessary to reach the good faith issue. I would affirm the judgment of dismissal.
 
 
 
 [1]
 These council members replaced those serving on the city council at the time of Owen's discharge
 
 
 [2]
 The claim for actual reinstatement has been abandoned (but not the backpay element of a reinstatement remedy) because Owen reached the mandatory retirement age of sixty-five during the course of the litigation in district court
 
 
 [3]
 As the district court noted:
 The United States Supreme Court first recognized that a public employee, who was discharged under circumstances imposing a "stigma" on his professional reputation and injuring his ability to find employment in the future, was entitled to notice and a hearing to clear his name in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). These cases were decided on June 29, 1972, more than two months after plaintiff's discharge. (Owen v. City of Independence, Mo., supra, 421 F.Supp. at 1118.)
 
 
 [4]
 The district court reasoned that the individual officials sued in their official capacities had no greater claim to good faith immunity than the City itself because any award against the officials would be paid from municipal funds. 421 F.Supp. at 1123
 
 
 [5]
 That section in relevant part reads:
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.
 
 
 [6]
 Appellees phrase the issue in terms of subject matter jurisdiction. Properly viewed, however, the issue is whether Owen has stated a claim. Clearly, Owen's claim "arises under" the Constitution or laws of the United States, and is not completely baseless or plainly foreclosed by prior decisions. Thus, 28 U.S.C. § 1331 affords a federal district court subject matter jurisdiction over cases such as this one. See, e. g., Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)
 
 
 [7]
 These holdings are not necessarily inconsistent with our cases awarding backpay to be paid by school districts, e. g., Wellner v. Minnesota State Junior College Bd., supra, 487 F.2d 153; Cooley v. Board of Educ. of Forrest City School Dist., supra, 453 F.2d 282. The parties in these cases did not question the school boards' status as "persons" under section 1983. In at least one case, we have assumed that school boards are "persons" suable under section 1983, Keckeisen v. Independent School District 612, 509 F.2d 1062, 1064-65 (8th Cir.), cert. denied, 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975)
 
 
 [8]
 As explained in the section of this opinion dealing with the remedy to be awarded Owen, infra, monetary relief in the nature of backpay is an "ordinary" or "necessary" remedy for the unlawful discharge of a public employee
 
 
 [9]
 We emphasize that, given the facts of this case, we discuss only an equitable remedy, which may include backpay, for an illegally discharged public employee. We do not intend to imply that municipalities are monetarily liable for each and every constitutional violation committed by their agents. For example, cases such as Adekalu v. New York City, 431 F.Supp. 812 (S.D.N.Y.1977), Crosley v. Davis, 426 F.Supp. 389 (E.D.Pa.1977), and Gresham v. City of Chicago, 405 F.Supp. 410 (N.D.Ill.1975), which refused to hold cities liable on a Bivens theory for brutality, false arrest and imprisonment, and unlawful search and seizure committed by individual police officers, absent proof that the cities' policy-making agencies or officials knowingly encouraged or tolerated such conduct, involve considerations of vicarious liability not present in this case where the conduct of the city's highest ranking officials allegedly resulted in the constitutional violation
 
 
 [10]
 The text of Roberts' statement, which is reproduced in full at 421 F.Supp. 1116 n. 2, in part recites:
 "On Saturday, April 15th for the first time I was able to see these 27 voluminous reports. The contents of these reports are astoundingly shocking and virtually unbelievable. They deal with the disappearance of 2 or more television sets from the police department and signed statement that they were taken by the Chief of Police for his own personal use.
 "The reports show that numerous firearms properly in the police department custody found their way into the hands of others including undesirables and were later found by other law enforcement agencies.
 "Reports whow (sic) that narcotics held by the Independence Missouri Chief of Police have mysteriously disappeared. Reports also indicate money has mysteriously disappeared. Reports show that traffic tickets have been manipulated. The reports show inappropriate requests affecting the police court have come from high ranking police officials. Reports indicate that things have occurred causing the unusual release of felons. The reports show gross inefficiencies on the part of a few of the high ranking officers of the police department." (Owen v. City of Independence, Mo., 421 F.Supp. 1110, 1116 n. 2 (1976).)
 
 
 [11]
 A lead article in the Independence, Missouri, Examiner for April 18, 1972, reported:
 The dismissal of the 35-year veteran police officer came on the heels of a massive police department audit of the property room and investigation into other areas of the department.
 The reports of that investigation were delivered to J. D. Williamson, an assistant Jackson County prosecutor, late Tuesday by one of the report investigators, Sgt. Robert Jackson.
 Lyle Alberg, city manager, made no comment on the firing but did name Lt. Lawrence Cook, a ten-year veteran of the department, as the new chief. Cook began his new duties today.
 While city manager Alberg did not subscribe to councilman Roberts' derogatory remarks about Owen, his later public announcement that he was referring the investigative reports to the county attorney for submission to the grand jury did reinforce the city council's implication of wrongdoing against Owen.
 
 
 [12]
 The court majority in Bishop v. Wood, supra, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684, commented that
 (t)he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. (Id. at 349-50, 96 S.Ct. at 2080 (footnote omitted).)
 Footnote 14 at p. 349, 96 S.Ct. at p. 2080 adds, in part:
 The fact of the matter, however, is that the instances in which the federal judiciary has required a state agency to reinstate a discharged employee for failure to provide a pretermination hearing are extremely rare.
 
 
 [13]
 At the district court's discretion, it may permit the parties to supplement the record by such additional evidence as may be available bearing upon Owen's likely earnings to retirement in the absence of his being deprived of his good name